No. 15,757.

AETNA CASUALTY & SURETY COMPANY ET AL. *v.* INDUSTRIAL COMMISSION ET AL.

(179 P. [2d] 973)

Decided March 17, 1947.   Rehearing denied April 28, 1947.

Mr. John P. Beck, for plaintiffs in error.

Mr. H. Lawrence Hinkley, Attorney General, Mr. Duke W. Dunbar, Deputy, Barbara Lee, Assistant, Mr. Isaac Mellman, for defendants in error.

*En Banc.*

Mr. Justice Alter delivered the opinion of the court.

This is a proceeding under the Workmen's Compensation Act. Kershaw, Swinerton & Walberg, a copartnership, was the employer; Ignacio Q. Correa, deceased, to whom we will hereinafter refer as decedent, was the employee; Santos Correa, the widow of Ignacio, and Jesse, a minor son, were dependents and claimants; and

the Aetna Casualty & Surety Company, a corporation, was the insurer.

The Industrial Commission awarded claimants full death benefits, and in an appropriate action the district court entered judgment affirming the award of the commission.

February 5, 1945, the employer was a general contractor engaged in construction work at the Rocky Mountain Arsenal near Denver, and decedent, who was their employee at the time, was assisting in handling barrels of oil in the course of employment. While engaged in such work he sustained an injury diagnosed as an umbilical hernia. The employer and insurer recognized the injury to decedent as compensable under the Workmen's Compensation Act, provided immediate medical aid, and, upon advice of physicians, tendered decedent a surgical operation for the repair of the hernia. February 10, 1945, decedent entered St. Luke's Hospital for the necessary operation, but, without undergoing the same, left the hospital on the same day.

Subsequently, and on March 26, 1945, a hearing was had before a referee of the Industrial Commission, at which hearing decedent was not represented by counsel but testified at length. From the record it appears that he was born in Old Mexico; was fifty-seven years of age; had consulted Dr. Wells, a physician at Brighton, and, when asked why he had not returned to the hospital for the operation, stated, "Because, you know, that when a person gets hurt, right away they help the family, but this time they did not." Upon being asked whether he now wanted an operation, he replied that if an x-ray examination revealed the necessity for an operation and if his compensation was paid, he would consent. At this hearing decedent was tendered an operation which was advised as necessary by Dr. Carl McLauthlin. At the conclusion of the hearing the referee made an order giving decedent twenty days within which to accept the insurer's offer of an operation for the correction

of the hernia, whereupon decedent said, "If they pay me since the day I got hurt, otherwise I will not accept anything," and further, "And they also have to x-ray me, because if I don't need it, I don't want to be operated."

Decedent further questioned the referee as follows: "Will they pay me any back pay, after the ten days you mention?" To which the referee replied that that was uncertain and was yet to be decided; and decedent then stated through an interpreter, "If you are not sure about making that back payment, he is not sure about being operated because he says he has to live too in this world."

May 28, 1945, there was another hearing before the referee, at which time decedent was represented by counsel, and Dr. Wells, his personal physician, appeared as a witness. Dr. Wells testified that the injury consisted of a small umbilical hernia and that it was his opinion that it would be a mistake to operate on decedent because of his physical condition, his obesity, his age, and his history. He further described decedent as very muscular, with a pendulous abdomen that protruded at least forty-five inches, and recommended the use of a small ventral pad as a corrective measure for the hernia. On cross-examination he was asked why he thought surgery would be worthless or harmful and answered: "If you look at the man, he is very obese, very much so. He depends for his livelihood upon his muscular exertion, in this particular instance shoveling and lifting. * * * He is handicapped at the present time by a very enlarged abdomen. That pressure of the contents of the belly naturally will press against the interior abdominal wall, which is the only support he has in that particular area. At his age, fifty-seven years, you can't expect those tissues to hold up as in a man of younger years. He gives a luetic history, which may not have any bearing on the healing, and also might. * * * If he was a man of ordinarily normal build with-

out this pendulous abdomen, I would say it would be a different problem." When asked by the referee as to decedent's heart condition, Dr. Wells replied that it was "very fair for a man of his age" and "as far as his heart is concerned, that is a minor matter." He further testified that the umbilical hernia was just large enough to admit the tip of a finger.

At this hearing Dr. William O. Clark testified from records kept at the hospital at the Rocky Mountain Arsenal, and Dr. Carl A. McLauthlin testified that his examination of decedent revealed nothing that disclosed him as a poor operative risk, and recommended surgery, stating that a ventral pad would not be sufficient. The referee also had the advantage of a narrative report by Dr. George B. Packard recommending surgery.

At the conclusion of the hearing the referee requested Dr. Frank J. Evans to examine the decedent and make a report as to his condition.

A third hearing was had July 16, 1945, wherein decedent appeared in person and by his attorney, at which hearing Dr. Evans testified that he examined decedent on May 29, 1945; the examination disclosed a positive Wasserman which might "be due to syphilis or to malaria"; that decedent's physical appearance did not convince him that the man was syphilitic, and that, even if he was, it would have no particular effect upon an operation. The witness further testified that he did not think an abdominal support was indicated and would be impractical, and that in his opinion decedent was "a good operative risk for a herniotomy." At this last hearing Dr. Evans was the only witness who testified, but at the conclusion of his evidence Mr. Mellman, who appeared as attorney for decedent, stated: "I would like to have the record show that the claimant does not desire an operation, that he fears such an operation."

The referee then gave decedent twenty days in which to accept or refuse the operation, and in the supplemental order found, "The said operation is now reason-

ably essential for the promotion of his recovery and no reason exists why the same should not be accepted by the claimant."

August 4, 1945, decedent submitted to an operation at St. Luke's Hospital, for the umbilical hernia, and on August 11, 1945, while still in the hospital, passed away.

Thereafter, and on October 15, 1945, a hearing was had before a referee other than the one who presided at the three previous hearings. Claimants were represented by Mr. Mellman, the attorney who had previously acted in that capacity for decedent. The referee announced, "Now it is a question whether the operation caused his [employee's] death." At this hearing Dr. Wells, the only witness called for claimants, stated that he had refused to recommend the operation at a previous hearing and testified that decedent had been reluctant about submitting to the operation because he feared it, and had stated to the witness that he was fearful of death as a result of an operation. When the witness was asked what was the cause of death he stated that he was not a pathologist, but that decedent had an enlarged heart, was very obese, short and stocky, with a thick neck, and thick, tortuous arteries. He stated as his opinion that apparently these conditions contributed to death following the operation. He further testified that at a previous hearing he had given as his opinion that decedent wasn't a good operative risk because he was too fat and had called attention to a leutic condition in decedent, but that he did not know whether this condition had anything to do with the death. He expressed the opinion that "fear and anxiety" on decedent's part was a contributing factor in his death. He also stated that he was in attendance during part of the time when an autopsy was performed upon decedent, and he was unable to determine whether decedent would have passed away at the exact time he did with or without reference to the operation, but in his opinion the operation contributed to the death. The witness was asked

concerning the diagnosis made by the prosector at the autopsy who found, as a primary diagnosis, that the cause of death was a syphilitic aortitis resulting in occlusion of the orifice of the left coronary artery by a mural thrombus, and with this diagnosis he apparently agreed. He stated, however, that he believed the operation was a contributing cause although he could not state whether decedent would have passed away at the time he did without reference to the operation and that the condition disclosed in a post-mortem examination was such that it might have occasioned death at any time. However, he insisted that notwithstanding the heart condition as disclosed by the diagnosis that condition was aggravated "by reason of inert fear and worry."

In the report of the examination of Dr. Wells by the referee, the following appears: "Q. Did you read this post-mortem report? A. Yes. Q. On this first page it says Anatomic Diagnosis, and it gives thirteen, you read that? A. Yes, sir. Q. Did you know at the time you testified here in the hernia case that he was afflicted with this condition in his heart? A. I testified at the previous hearing the man had syphilis. I testified he was a poor operative risk. In fact, I called the Commission's attention to the fact that he was diagnosed as syphilitic, and had had a poor healing in his leg at that time. Q. Did you know he had syphilitic aortitis? A. No. I stated, however, that the man was very wheezy and was short of breath on exertion for at least two months before the operation. That is a matter of medical knowledge, a matter of just observation by anybody. I think the record indicates very clearly I said the man was a poor operative risk. I was out-ruled, however, on that. Q. I heard you say that myself. A. I expect you wonder why I said it, too. I am sorry now we didn't put the man on the stand, because he was not physically a good operative risk to look at him. Q. You didn't specify, other than what you have stated here, what was

wrong with him. A. Sometimes on the stand it pays to keep your mouth shut. They don't like to have you talk too much. At the same time, I try to answer what is asked. Q. You haven't answered my question just now. A. Pardon me. Q. I said you hadn't on the stand stated other than you have stated today the reason why he was a poor operative risk. A. I probably wasn't asked to go into details."

This was all of the evidence introduced on behalf of claimants, except it was stipulated that a Mr. Fisher, if called, would testify that the "claimant [decedent] expressed fear and anxiety at various times within the period February 5 and August 4, 1945.

The employer and insurance carrier called as a witness Dr. S. K. Kurland, who specialized in clinical pathology. He testified that he had examined the post-mortem report concerning the death of Ignacio Correa, and, when asked if he had familiarized himself with the report, replied that he had. In answer to a hypothetical question, witness gave as his opinion that there was no connection between the surgery for repair of the umbilical hernia and decedent's passing and that fear and anxiety would not tend to accelerate the occlusion in the coronary artery. On cross-examination he testified that in his opinion decedent was not a good operative risk because of a mural thrombus of the aorta which had been present for a number of months prior to death, and he stated generally that there was no causal connection between the operation and decedent's death, which was occasioned by occlusion independent of any surgery. This witness further testified that the thrombus could not have been diagnosed or detected; that the direct cause of death was the occlusion by the thrombus, and the only contributing cause was a pulmonary edema which followed in natural sequence from the occlusion.

Dr. McLauthlin was the surgeon who operated upon decedent. He testified that the hernia was scarcely large enough for the insertion of the tip of one's finger. The

operation was a minor one consisting of making a small incision through the skin, perhaps an inch and a half in length, exposing a small area in the fascia and putting some sutures of heavy silk through this fascia without making an opening into the inside of the abdomen. The peritoneum was not opened at all and the sutures were inserted through the skin under a local anesthetic; that during the operation the decedent was not unconscious at any time and immediately thereafter ate his lunch and improved very rapidly, with no complications; the seventh day after the operation he was permitted to sit up, but about 7:15 that night he died as a result of a sudden heart attack; that decedent had never expressed any fear or foreboding of any kind with reference to the operation, and his blood pressure measurements showed 140 systolic and 90 diastolic, which were within normal limits.

Dr. Richard H. Mulligan was the prosector. He specialized in pathological anatomy and was associate professor of pathology in the University of Colorado School of Medicine. He made a post-mortem examination of the body of decedent. He testified that the cause of death was occlusion of the left coronary artery on the basis of syphilitic aortitis, and, secondly, arteriosclerosis; that in his opinion the cause of death and the operation were related only as a coincidence and the underlying process would have caused his death at the time it occurred regardless of the operation; that he knew of no clinical means by which it was possible to determine whether a thrombus existed in decedent, and that, in his opinion, decedent would have passed away at the exact time of his death, regardless of the operation. He gave it as his opinion that there was no causal connection between the operation and the death. In response to a question as to the presence of new material disclosed by a microscopic examination in the thrombus, this witness testified that the operation had no clinical significance whatever respecting this condition.

November 1, 1945, following the fourth hearing, the referee entered a supplemental order which the commission approved and adopted on January 3, 1946. In this supplemental award, approved by the commission, after a finding that the claimant "sustained an injury accidently incurred, arising out of and in the course of his employment," the referee found and determined that decedent entered the hospital on August 4, 1945, and died on August 11, 1945, from a "thrombosis *and other heart ailments.*" He further found that decedent's personal physician testified "that the claimant was not a good operative risk and that the deceased was afraid that he would die of the operation."; that *"decedent also testified at the prior hearing that he did not want the operation; that he was afraid that he would die under the operation."* There was a further finding that decedent's fear and anxiety concerning the operation was a contributing factor in his death. The referee ordered payment of compensation in the sum of $4,375.00; payment to the widow of $125.00 to reimburse her for funeral expenses incurred; payment of medical, surgical and hospital expenses not to exceed $500.00, and entered certain orders with reference to the payments to the minor son, Jesse.

As heretofore noted, the referee found that: "Decedent also testified at the prior hearing that he did not want the operation; that he was afraid that he would die under the operation." This statement, or one of like nature credited to decedent, is a distortion of the facts for, according to the record, decedent never expressed any such fear or anxiety. As a matter of fact, rather than testifying to any expression of fear or anxiety, he assigned another entirely different and much more practical reason for not submitting to an operation; and that reason had finances only as its basis.

One of the specification of points, and the only one which we deem necessary to consider, challenges the award as not being supported by the evidence and that

the evidence fails to show any causal connection between the injury and the cause of death. The pertinent part of the supplemental order reads:

"He entered the hospital August 4, 1945 and was operated on for the repair of his hernia on said date, and died August 11, 1945, from a *thrombosis and other heart ailments.*

"The Referee further finds from the evidence that the deceased's personal physician testified at the hearing for the accidental injury that the claimant was not a good operative risk and that the deceased was afraid that he would die of the operation. Decedent also testified at the prior hearing that he did not want the operation; *that he was afraid that he would die under the operation.*

"The Referee further finds from the evidence that decedent's *fear and anxiety* concerning the operation was a contributing factor in his death. * * * " (Italics ours)

■ It will be noted that the commission found that the cause of death was a "thrombosis and other heart ailments," but there is no finding that the "thrombosis and other heart ailments" was in any wise connected with or related to or resulted from either the injury or the operation. The cause of death being from a "thrombosis and other heart ailments," and being wholly unconnected or related to either the injury or the operation, according to the findings of the commission, death benefits did not accrue. The commission did find, however, that decedent's "fear and anxiety" was a "contributing factor in his death," which the commission already had determined was due to "thrombosis and other heart ailments." Unless the commission found from evidence introduced that the injury and attendant operation was related to the "thrombosis and other heart ailments," the causal connection sufficient to make this action compensable was lacking, and "fear and anxiety" as to the operation wholly immaterial. As we view the matter, if the injury necessitated an operation and if the

operation resulted in a "thrombosis and other heart ailments" from which the employee's death resulted, the claimants would be entitled to the statutory award with or without any element of "fear and anxiety." "Fear and anxiety" of themselves are not compensable, and where a compensable injury is involved and an operation for the correction thereof follows, resulting in the death of the employee, no contributing cause whatever is necessary or material in the consideration of an award. We, therefore, conclude that if the "thrombosis and other heart ailments" were the result of an operation which decedent was obliged to undergo for the correction of an injury accidently incurred and arising out of and in the course of his employment and death followed, compensation as a matter of course should be awarded.

Attorneys for claimants and the Industrial Commission, seem to rely upon our decision in *National Lumber & Creosoting Co. v. Kelly,* 101 Colo. 535, 74 P. (2d) 144, to support their contention that "fear and anxiety" may be found to be a contributing cause in the instant case and the death compensable. An examination of the entire record in the National Co.-Kelly case convinces us that there is no support therein for that contention. As we understand it, it discloses the following facts: The Industrial Commission on remand after our decision, reported in 99 Colo. 442, increased its award by finding that Kelly was permanently and totally disabled. The insurance carrier contended that because it had offered operative surgery to Kelly and he had long delayed in accepting the same, his injury became greatly aggravated, whereas if he had accepted operative surgery at the time first tendered, the disability would have been greatly lessened, if not entirely corrected. The record discloses that Kelly, upon advice of his physician, delayed the operation because of fear and anxiety, but ultimately submitted thereto. In connection with the delayed operative surgery, we said: "There may have been a relationship between the delay in the operative

treatment of the claimant's head injury and his subsequent total disability, but under the circumstances in this case it may not be held against the claimant because he acted on the advice of his physician. Even as to that relationship, there was a conflict in the testimony, and we see no occasion to disturb the *Commission's finding that the delay in operative treatment of claimant's head injury did not contribute* to his present total disability." (Italics presently indicated) It appears from the record and the quoted portion of the opinion and the findings of the commission that Kelly's delay in submitting to the operative surgery did not contribute to his disability; hence "fear and anxiety" which may have occasioned the delay, became wholly immaterial, and any reference to "fear and anxiety" in the case is obiter dicta.

■ In the present case, in order to render the death compensable, the evidence must establish a causal connection between the injury, the operation, and the "thrombosis and other heart ailments" before the commission may properly enter an award in favor of claimants. If "fear and anxiety" is to be considered in this connection, then there must be evidence of a causal connection between the injury, the operation, the "thrombosis and other heart ailments" and "fear and anxiety" to make the death compensable, and there is here no such finding.

■ Decedent's injury was admittedly compensable and an operation for its correction was performed. However, there was no finding by the commission of a causal connection between the injury, the operation and the "thrombosis and other heart ailments" from which death resulted. In the absence of such finding, no compensation could properly be awarded, and if the causal connection is found as indicated and is supported by competent evidence, "fear and anxiety" on decedent's part is wholly immaterial, and a finding by the commission that it was a contributing factor would be surplusage.

The judgment is reversed and the cause remanded to

the district court with instructions to recommit it to the commission for such further action, if any, as may be authorized under the provisions of the Workmen's Compensation Act and in accordance with the views herein expressed.

MR. CHIEF JUSTICE BURKE and MR. JUSTICE HILLIARD dissent.